# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

STEPHANIE SNOW POIROUX, et al.,          )
                                          )
       Plaintiffs,                        )
                                          )
v.                                        )          Civil Action No.: 03-0338-BH-M
                                          )
THE CITY OF CITRONELLE, et al.,           )
                                          )
       Defendants.                        )

## ORDER

This matter is before the Court on the parties' Supplemental Briefs (Docs. 54 & 56) regarding summary judgment in this matter. These briefs were ordered by this Court upon the remand of this case from the Eleventh Circuit Court of Appeals. This Court's finding that summary judgment was appropriate for Plaintiff's claims of violation of 28 U.S.C. §1983 against Officer Marshall Chennault has been reversed and the issue is now set for trial. Furthermore, due to the remand of this federal claim, Plaintiff's state law claims have also been reinstated against Defendants Officer Marshall Chennault, Officer Clint Jordan, Officer Keith Miller, Clarence Parker, Dispatcher Eva Henderson, the late former Police Chief Clarence Parker and Assistant Chief of Police Conrad Reid.

Upon review of the parties' Supplemental Briefs, the following concessions have been made by both sides. First, Defendants concede that the wrongful death claim under Alabama law against Officer Marshall Chennault, like the 28 U.S.C. §1983 claim against him, is not appropriate for summary judgment. Also, Plaintiff concedes all but three of the remaining state law claims should be dismissed. Plaintiff contends that only the Alabama law wrongful death claims against Defendants Eva Henderson and Clint Jordan and the Alabama law failure to train claim against Defendant Conrad Reid should escape dismissal

by this Court.  Therefore, the Court finds that the Alabama law wrongful death claim against Defendants Keith Miller and Clarence Parker are **due to be DISMISSED**.

## I.      Alabama Wrongful Death Claims[1]

Pursuant to Alabama Code §6-5-410, a cause of action may be brought against a person whose "wrongful act, omission, or negligence" results in the death of another.  The Alabama Supreme Court has held, in the jail suicide context, that "proof of the existence of a duty owing from the defendant to the injured party is a prerequisite for proving negligence or wantonness and that the question of whether a legal duty exists is essentially a question of law for the court, to be resolved by determining whether the injury was foreseeable."  *City of Crossville v. Haynes*, 2005 WL 1926435, *6 (Ala. 2005)(citing *Keebler v. Winfield Carraway Hosp.*, 531 So.2d 841, 844 (Ala. 1988)).   The "controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is  whether the defendants reasonably should have anticipated that the deceased would attempt to harm himself."  *Popham v. City of Talladega,* 582 So.2d 541, 543 (Ala. 1991).  "Without foreseeability that the decedent would attempt suicide, there can be no recognized legal duty to prevent a suicide attempt and, thus, no right of recovery."  *Haynes*, 2005 WL 1926435 at *9.  The Alabama Supreme Court further stated that forseeability of a suicide could only be established if the deceased had a history of suicidal proclivities known to the defendants, or if the deceased manifested suicidal proclivities in the presence of the defendants, or the deceased was admitted to the facility because of a suicide attempt.  *Popham*, 582 So.2d at 543; *Haynes*, 2005 WL 1926435 at *6.

---

[1] The Court relies on its original "Findings of Fact," as proffered in its Order (Doc. 45) originally granting summary judgment as to Plaintiff's federal claims.  Though reversing, in part, our decision in that Order, there have been no indications nor contentions that the Court's "Findings of Fact" was erroneous in any way.

A.   *Clint Jordan*

Officer Jordan transported Poiroux to Springhill Memorial Hospital where she received treatment in response to her complaints of seizure and migraine headache.  (Doc. 40, Springhill Memorial Records). When Poiroux was presented to the emergency room personnel in the early morning hours of June 3, 2001, she was complaining of a seizure and a migraine headache, but denied having suicidal ideations.  (*Id.*). Before seeing a doctor, Officer Jordan overheard Poiroux telling a nurse that she had tried to overdose in the past using pills.  The Emergency Physician Report for that morning indicates that Poiroux was seen by Dr. Donna Ballard, who diagnosed Poiroux with depression and instructed the patient to follow up with her personal physician.  The Emergency Physician Report confirms that Officer Jordan remained in the hallway when Poiroux was placed in an examination room with her handcuffs removed.  Officer Jordan states that he did not receive any documentation from Springhill Memorial Hospital and is not aware of any documentation being given to Poiroux.

Officer Jordan admits that the doctor at Springhill Memorial Hospital told him that Poiroux might need to go to Mobile Infirmary.  Plaintiff asks the Court to presume that the doctor's reference to Mobile Infirmary is with regard to its facility for treating psychiatric patients. However, the Springhill Memorial doctor's vague comment about Mobile Infirmary does not clearly make reference to psychological or psychiatric treatment.  In fact, there is no evidence that the medical professionals at Springhill Memorial Hospital made any reference to Poiroux's need for additional psychiatric or psychological evaluation. More importantly, the records from Springhill Memorial Hospital reflect that Poiroux denied having suicidal ideations and that the medical professionals at Springhill Memorial Hospital discharged her without further instructions to Officer Jordan.

As Springhill Memorial Hospital did not have the proper release forms for blood and urine

specimens, Officer Jordan transported Poiroux to USA Medical Center.  Officer Jordan admits that while they were at USA Medical Center, he overheard Poiroux make a statement to the emergency room doctor about a prior overdose attempt, but he did not receive any specific information about that attempt. The records from USA Medical Center document that Poiroux told the emergency room physician that she was experiencing suicidal ideations, but there is no evidence that Officer Jordan overheard Poiroux make any statement about experiencing current suicidal ideations.  One of the emergency room doctors at USA Medical Center told Officer Jordan that he was going to contact Mobile Mental Health Center because of some of the things Poiroux told him during the examination.  The emergency room doctor also told Officer Jordan that he was ordering some additional tests for Poiroux.  While there is an inference that the doctor at USA Medical Center wished to contact Mobile Mental Health because of Poiroux's current suicidal ideations, there is no evidence that this specific inference was relayed to Officer Jordan.

Apparently, Officer Jordan was told by an emergency room doctor at Springhill Memorial Hospital that Poiroux might need to go to Mobile Infirmary and Officer Jordan was told by an emergency room doctor at USA Medical Center that he had contacted Mobile Mental Health about Poiroux.  None of the doctors from either hospital instructed Officer Jordan that Poiroux needed additional psychological counseling or treatment.  The Court finds that the references to Mobile Infirmary and Mobile Mental Health do not warrant an inference that Poiroux's subsequent suicide was, or should have been, foreseeable by Officer Jordan.

Next, Plaintiff relies on the medical records from USA Medical Center to support the inference that Officer Jordan had a subjective awareness of Poiroux's suicidal mental state, thus making her action foreseeable.  A review of these records in conjunction with the testimony of Officer Jordan and the medical providers at USA Medical Center renders such inference unreasonable.  The Outpatient Record and the

Discharge Checklist for Poiroux from USA Medical Center both contain the words "suicidal ideation," but Plaintiff has presented no evidence that this information was passed along to Officer Jordan or any of the other individual defendants.  The Court finds unreasonable an inference that such transfer of information occurred.

Poiroux was seen at USA Medical Center by Dr. James Wan and Dr. Nicholas Guan.  Dr. Wan does not recall treating Poiroux or speaking to Officer Jordan on June 3, 2001.  (Doc. 37, Wan depo. p. 27; 30-31).  Dr. Wan testifies that Officer Jordan would not have been allowed to look at the medical records of Poiroux that morning because of patient confidentiality, nor would Officer Jordan have been given a copy of any of those records.  (*Id*. at 31-32).  Neither would Poiroux have been given a copy of her medical records.  (*Id*. at 28-29).  Although he has no recollection of that night, Dr. Wan speculates that he would have instructed the nurse to convey to the patient or police officer the statement from the Outpatient Record that reads "will give Rx for home meds; to be taken into custody and observed."  (*Id*. at 27,30,60).  Regardless, Dr. Wan's statement would not have provided Officer Jordan with specific information about why Poiroux needed to be observed or how she should be observed.

Lisa Archie was the USA Medical Center emergency room nurse involved with the treatment of Poiroux on June 3, 2001. Nurse Archie does not recall treating Poiroux or speaking to Officer Jordan that night. (Doc. 37, Archie depo. pp. 15-21).  At the time, Dr. Nicholas Guan was a resident in the Department of Psychiatry with the USA Medical Center, but he rotated as an intern through its various departments. (Doc. 37, Guan depo. p. 9).  During Dr. Guan's one month rotation in the emergency department, his supervising physician in the emergency room was Dr. Wan. (*Id*. at 13, 23).  Accordingly, Dr. Guan had to rely on Dr. Wan to make any final recommendations or orders upon discharge of a patient. (*Id*. at 15).  Dr. Guan does not recall treating Poiroux nor does he recall even if there was a police officer

with Poiroux that night.  (*Id.* at 14, 22).

Dr. Wan and Nurse Archie both agree that if he had given her specific instructions to relay to the patient, then those instructions would likely have been charted on the Patient Instruction Sheet.  (Wan depo. p. 53; Archie depo. pp. 23-24).  Dr. Wan confirms that the only medical records that might have been given to the patient are the Patient Instruction Sheet and her prescriptions.  (Dr. Wan depo. pp. 53-54).  Importantly, Poiroux's Patient Instruction Sheet and her prescriptions do not mention a suicidal ideation or warn of a risk for self-harm. According to his testimony, Officer Jordan conversed with USA Medical Center personnel only about how Poiroux's written prescriptions were to be administered.

In determining Officer Jordan's possible liability as to the federal claims filed against him, the Court found that coupled with the testimony of Dr. Wan, Dr. Guan, Nurse Archie, and Officer Jordan, the USA Medical Center records at issue did not support the inference that Officer Jordan had a subjective awareness of a strong likelihood of imminent suicide by Poiroux.  Under Alabama law, however, Plaintiff's burden is not so steep.  Now the Court is faced with the question of whether the deceased's suicide was reasonably foreseeable to the defendant.  For the most part, the facts indicate that it was not reasonably foreseeable to Officer Jordan that Poiroux would commit suicide.  However, the Alabama Supreme Court has held that the foreseeability can be sufficient when the defendant had knowledge of deceased's history of suicidal proclivities.  In the instant case, it is clear that Officer Jordan had some knowledge of Poiroux's history as he twice overheard her mention that she had attempted to overdose on pills in the past.  Though this information is not sufficient to sustain a federal §1983 claim, it does seem to fulfill Plaintiff's burden that Poiroux's death was foreseeable under Alabama law and, thus, is not ripe for summary judgment on that ground.

Because the Court has determined that a jury could find that Poiroux's suicide was reasonably

foreseeable to Officer Jordan, his "peace officer" immunity, under Alabama Code §6-5-338(a) is not applicable.  The  Alabama statute extends "state-agent"  immunity for "peace officers" arising out of their conduct of a discretionary function within the line and scope of their law enforcement duties.   *Howard v. City of Atmore*, 887 So.2d 201, 203 (Ala. 2003); Ala. Code §6-5-338(a) 1975.   Therefore, the applicability of the  peace officer immunity is to be addressed under the  principles set forth in *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000).  *Howard*, 887 So.2d at 203.          Despite the general immunity for acts performed by peace officers in their law enforcement duty, in *Cranman* the Alabama Supreme Court noted a state agent is not immune from civil liability  when he acts "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  792 So.2d at 405.  In the instant case, the Court finds that because a jury could find that Officer Jordan should have reasonably foreseen Poiroux's, it could also be determined that his failure to report this reasonably foreseen possibility to his fellow officers was willful, malicious or in bad faith.  Taking all the facts in a light most favorable to the non-moving party, the Court finds that there are genuine issues of material fact as to whether Officer Jordan should have reasonably foreseen Poiroux's suicide attempt and, if so, was his failure to report this information a willful, malicious or bad faith omission.  Therefore, Defendants' Motion (Doc. 27) and Supplemental Brief (Doc. 54) for Summary Judgment, as to the Alabama state law claim of Wrongful Death against Officer Clint Jordan, are due to be **DENIED**.

    **B.**    ***Eva Henderson***

    Dispatcher Henderson states that while she witnessed Poiroux acting in a disruptive manner, she never heard Poiroux make any statements about suicide or saw her exhibit any behavior which might indicate that she was suicidal.  As Officers Jordan and Chennault admit that they did not inform Dispatcher Henderson of any suicidal ideations, Dispatcher Henderson had no reason to believe that Poiroux was a

threat to commit suicide.

There is no evidence that Dispatcher Henderson was aware that Poiroux was contemplating or making preparations for suicide. Dispatcher Henderson now admits that she saw Poiroux tearing strips of a blanket in her cell, but Dispatcher Henderson thought at the time that Poiroux was playing with or tearing pieces of toilet paper. To support her testimony, Dispatcher Henderson offers that had she realized Poiroux was tearing strips of a blanket and not toilet paper, she would have taken steps to stop such behavior whether she thought Poiroux was preparing a noose or simply destroying city property. Furthermore, the Court points out that Dispatcher Henderson checked on Poiroux at 9:00 p.m. and that Poiroux was found hanging approximately ten minutes later. Apparently, when Dispatcher Henderson first saw Poiroux hanging in the cell she believed that Poiroux was leaning over the sink possibly to wash her face. Once Dispatcher Henderson and Officer Miller realized that Poiroux was actually hanging, they made immediate efforts to assist her.

According to the jail log, Dispatcher Henderson checked on Poiroux at 8:30 p.m. and 9:00 p.m. Had Dispatcher Henderson been aware of a strong likelihood of imminent suicide, she testifies that she would have checked on Poiroux every fifteen minutes instead of every thirty minutes. As Dispatcher Henderson called Assistant Chief Reid at approximately 9:10 p.m. to notify him of the situation, Poiroux committed suicide within an approximate ten minute time frame, to wit, between 9:00 and 9:10 p.m. Hence, Dispatcher Henderson's actual monitoring of Poiroux falls within the fifteen minute monitoring interval for suicidal detainees. In addition, Dispatcher Henderson maintained contact with Poiroux because the latter was constantly beating on the dispatcher's window and attempting to speak through its opening. Dispatcher Henderson kept the video camera trained on the female holding area so that she could watch Poiroux more regularly. After Poiroux was quiet for only a few minutes, Dispatcher Henderson and Officer

Miller checked on her, found her hanging, and immediately came to her assistance.

Based on the already discussed standards established in *Popham* and *Haynes*, the Court finds that Dispatcher Henderson owed no duty to the decedent because her suicide attempt was not foreseeable. It is undisputed that Henderson had no knowledge of Poiroux's suicidal history. Further, Poiroux neither manifested suicidal proclivities in the presence of the Henderson nor was she admitted to the facility because of a suicide attempt. Therefore, the Court finds that the evidence does not rise to the level necessary to establish that defendant could have or should have reasonably foreseen Poiroux presented a threat to herself. Based upon this lack of foreseeability, the Court finds that Defendants' Motion (Doc. 27) and Supplemental Brief (Doc. 54) for Summary Judgment, as to the state law Wrongful Death claim against Dispatcher Eva Henderson, are **due to be GRANTED**.

## II.    Alabama Failure to Train Claim

### A.    *Assistant Chief of Police Conrad Reid*

Plaintiff also asserts a claim of failure to train against Assistant Chief of Police Conrad Reid for his failure to adequately train Eva Henderson and/or the rest of the staff at the jail to prevent the suicide of Poiroux. Specifically, Plaintiff cites that there was not a written suicide policy and there were different interpretations as to its oral policy. (Suppl. Brief, Doc. 57, p. 6). The Court finds, however, that this claim is inappropriate as it is precluded by Reid's immunity under Alabama Code §6-5-338(a). As already discussed, Reid is provided immunity as a "peace officer" for his discretionary actions taken while in the line or scope of his employment. *Howard*, 887 So.2d at 203. The establishment of policies and procedures, including the manner in which the employees of the police department are trained to supervise, evaluate, and monitor arrestees and prisoners, is within the Reid's judgment in the administration of the department. *Haynes*, 2005 WL 1926435, *10. Therefore, based on Assistant Chief of Police Conrad

Reid's "peace officer" immunity, the Court finds that Defendants' Motion (Doc. 27) and Supplemental Brief (Doc. 54), as to the Alabama state law claim of Failure to Train against him, are **due to be GRANTED**.

### III.    Conclusion

Based on the above findings and analysis, the Court holds that Defendants' Motion (Doc. 27) and Supplemental Brief (Doc. 54) are **due to be and hereby GRANTED IN PART and DENIED IN PART**.  As to the federal §1983 and Alabama law wrongful death claims against Officer Marshall Chennault, the Court finds that summary judgment is **hereby DENIED**.  The Court also finds summary judgment on the state law claim of wrongful death against Officer Clint Jordan is **hereby DENIED**.  However, as to all other claims asserted in this suit, as ruled on either in this Order or in previous Orders, the Court finds that Defendants' Motion for Summary Judgment is **due to be and hereby GRANTED**.

**So ORDERED**, this 13th day of October, 2005.

_____
s/ W. B. Hand
SENIOR DISTRICT JUDGE